**Robert H. Murphy (RM1748)**
**Andrew O. Schiff**
**Alejandro O. Soto**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**Miami Regional Office**
**801 Brickell Avenue—Suite 1800**
**Miami, Florida 33131**
**Phone:  (305) 982-6390 (Schiff)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>      **Plaintiff,**<br><br>  -against-<br><br>**TERMINUS ENERGY, INC.**<br>**DANNY B. PRATTE,**<br>**JOSEPH L. PITTERA,**<br>**GEORGE DOUMANIS,**<br>**EMANUEL PANTELAKIS, and**<br>**JOSEPH ALBORANO,**<br><br>      **Defendants,**<br><br>  -and-<br><br>**MARIA PANTELAKIS,**<br><br>      **Relief Defendant.** | 17-CV-_____ (  )<br><br>ECF Case<br><br>Jury Trial Demanded |

## <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against defendants Terminus Energy, Inc. ("Terminus"), Danny B. Pratte ("Pratte"), Joseph L. Pittera ("Pittera"), George Doumanis ("Doumanis"), Emanuel Pantelakis ("Pantelakis"), and Joseph Alborano ("Alborano") (collectively, "Defendants"), and relief defendant Maria Pantelakis ("M. Pantelakis"), alleges as follows:

## SUMMARY

1.      This action concerns an offering fraud orchestrated by four insiders at
Terminus—a microcap company purportedly involved in the development of fuel cell
technology—and the use of unregistered brokers to sell Terminus securities.

2.      From October 2008 through April 2013 ("relevant time period"), Terminus, Pratte
(Terminus's CEO), Pittera (its president and legal counsel), Doumanis (its operations manager),
and Pantelakis (a director of Terminus), raised approximately $7.9 million through the sale of
Terminus securities to at least 200 investors in the U.S. and abroad.

3.      In private placement memoranda ("PPMs"), filings with OTC Markets Group,
Inc. ("OTC Markets"), and business plans, Terminus, Pratte, Pittera, Doumanis, and Pantelakis
misled investors about the research, development, and profitability of Terminus's fuel cell
business, claiming that Terminus had a viable prototype capable of being sold and earning
revenue, when in fact Terminus had never completed development of the fuel cell and lacked the
funds to do so.

4.      Terminus, Pratte, Pittera, Doumanis, and Pantelakis also misled investors about
the use of investor proceeds.  Terminus paid unregistered brokers commissions of at least 30%,
far in excess of the 13% represented in the PPMs.  Terminus, Pratte, Pittera, Doumanis, and
Pantelakis also failed to disclose that Pratte, Pittera, and Pantelakis were converting substantial
amounts of investor funds to their own use.

5.      The PPMs and OTC Markets filings also failed to disclose that (a) Doumanis—a
convicted felon who the Commission had barred from participating in penny stock offerings—
was secretly acting as an executive officer of Terminus, and (b) Pantelakis, a Terminus director,

had previously been permanently barred by FINRA from associating with any FINRA member. Doumanis violated his penny stock bar through his involvement in Terminus's stock offerings.

6.     Alborano, who was never registered with the Commission, solicited and sold investments in Terminus and received over $1 million in commissions.

## VIOLATIONS

7.     By virtue of the conduct alleged herein, Terminus, Pratte, and Pittera, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.     By virtue of the conduct alleged herein, Doumanis and Pantelakis directly or indirectly, singly or in concert, violated and are otherwise liable for violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)].

9.     By virtue of the conduct alleged herein, Doumanis violated Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o(b)(6)(B)(i)].

10.     By virtue of the conduct alleged herein, Alborano violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

11.     By virtue of the conduct alleged herein, Doumanis and Pantelakis, directly or indirectly, singly or in concert, violated and are otherwise liable for aiding and abetting Alborano's violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

12.     Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment:  (a) restraining and permanently enjoining (i) each of the Defendants from engaging in the acts, practices and courses of business alleged against them herein, and (ii) Doumanis from participating in or inducing the issuance, purchase, offer, or sale of any security, other than those traded on a national securities exchange for his own account; (b) ordering each of the Defendants and M. Pantelakis to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; (c) imposing civil money penalties on each of the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) barring Pittera, Pratte, Doumanis, Pantelakis, and Alborano from participating in future penny stock offerings pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; (e) barring Pittera, Pratte, Doumanis, and Pantelakis from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 77l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and (f) ordering Doumanis to comply with the penny stock bar previously entered against him pursuant to Section 21(e) of the Exchange Act [15 U.S.C. § 78u(e)].

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.  Specifically, during the time of the conduct at issue, prices for the common stock of Terminus were quoted under the symbol TMGY on the OTC Links system (previously "Pink Sheets") operated by OTC Markets, which is located in the Southern District of New York. Disclosures described herein relating to Terminus were sent to, received by, and published by OTC Markets.

## DEFENDANTS

16.     **Terminus** is a Delaware corporation headquartered in Torrance, California. During the relevant time period, it purported to be in the business of developing, manufacturing, and selling power generation products such as fuel cells.  Originally incorporated in 1993 as Avistar Acquisitions, Inc., Terminus is the latest iteration of a company that has operated under different names with completely unrelated business lines, including EuroWork Global Limited ("EuroWork") and Quintessence Holdings, Inc. ("Quintessence").  In June 2008, Quintessence entered into a business combination with a privately-held company owned by Pratte, and in 2009 changed its name to Terminus.  Terminus's securities are not registered pursuant to the Exchange

Act and it is not subject to the reporting obligations under Exchange Act Sections 13(a) and 15(d) [15 U.S.C. §§ 78m(a), 78o(d)].

17.     **Pratte,** age 62, is a resident of Columbia, Missouri.  He has been the CEO of Terminus since 2008.

18.     **Pittera**, age 49, is a resident of Torrance, California and an attorney licensed to practice law in California.  Pittera was president of Terminus and its predecessor entities from approximately 2005 until 2012, and served as the company's legal counsel.  By means of the conduct alleged in this complaint, Pittera received approximately $145,000 from Terminus for, among other things, legal services.  In a prior case brought by the Commission, the United States District Court for the Southern District of Florida entered a default judgment against Pittera, permanently enjoining him from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)], ordering disgorgement and civil penalties in the amounts of $5,823.29 and $50,000, respectively, and permanently barring him from participating in an offering or sale of a penny stock. *SEC v. OTC Capital Partners, LLC, et al.*, Case No. 1:16cv20270 (S.D. Fla. May 31, 2016).

19.     **Doumanis**, age 57, is a resident of Rocky Point, New York.  From 2005 until at least 2013, Doumanis acted as an undisclosed executive officer of Terminus and its predecessor entities.  Prior to that, on April 30, 2003, Doumanis pleaded guilty to conspiracy to commit wire, mail, and securities fraud related to his role in the fraudulent offering of securities of Integrated Homes, Inc. and was sentenced to 14 months in prison. *U.S. v. George Doumanis*, Case No. 02-cr-20452 (S.D. Fla. 2003).  Subsequently, in 2005, the Commission issued an order barring Doumanis from participating in any penny stock offering and from being associated with any

broker or dealer. *In the Matter of David Rich et al.*, Exchange Act Release No. 51744, Admin. Proc. No. 3-11939 (June 2, 2005) ("Penny Stock Bar Order").

20.     **Pantelakis,** age 41, is a resident of Flushing, New York, and is Doumanis's nephew.  He served as a director of Terminus from 2008 until 2011.  Prior to that, in 2008, Pantelakis, without admitting or denying the allegations, consented to findings by FINRA that he fraudulently misrepresented and omitted material facts in connection with the sale of securities and was permanently barred by FINRA from association with any FINRA member in any capacity.  *Disciplinary and Other FINRA Actions Reported for March 2008*, http://www.finra.org/sites/default/files/DisciplinaryAction/p038140.pdf.

21.     **Alborano**, age 52, is a resident of New Egypt, New Jersey.  Alborano, who has never held any securities license or been registered with the Commission, solicited and sold investments in Terminus securities.

<u>**RELIEF DEFENDANT**</u>

22.     **M. Pantelakis**, age 37, is a resident of Flushing, New York, and is Pantelakis's wife.  Although M. Pantelakis played little to no role in Terminus and was not entitled to receive any monies therefrom, she nevertheless received payments totaling approximately $300,000 derived from funds raised from Terminus investors.  She used these funds for personal expenses, including payments on personal credit cards and on two Mercedes-Benz automobiles.

## FACTS

### Background

23.     In 2004, shortly after Doumanis was released from prison for securities fraud, Pittera—knowing of Doumanis's criminal conviction and Penny Stock Bar Order—hired him as operations manager for EuroWork, a predecessor entity of Terminus.

24.     Prior to 2008, Pratte had raised money to develop fuel cell technology but was unable to develop the technology.  In March of 2008, with no developed product or money, Pratte partnered with Doumanis and Pantelakis to lay the foundation for Terminus.  In June 2008, Quintessence (formerly EuroWork) entered into a business combination with Terminus, and in 2009 changed its name to Terminus (quoted on OTC Link under the ticker TMGY).  The business combination was accomplished with the undisclosed participation and consent of Joseph A. Mann ("Mann"), a convicted felon who controlled a number of entities that held large blocks of Terminus shares.  Pratte was named chairman and CEO of Terminus, Pittera was president, and Pantelakis became a director.

25.     Unbeknownst to the investing public, Doumanis continued to run significant aspects of Terminus behind the scenes by, among other things, controlling company bank accounts with little to no oversight, setting compensation for brokers, and spearheading the drafting and dissemination of false and misleading press releases.

### Terminus Raised Funds from Investors Pursuant to PPMs and Business Plans

26.     From October 1, 2008 through April 2013, Terminus raised approximately $7.9 million from over 200 investors, using various PPMs and business plans to offer and sell Terminus securities.

27.     Terminus raised these funds with the assistance of Doumanis and Pantelakis, who presided over a sales operation run by a number of "consultants"—a term that Doumanis,

Pantelakis, and Pratte used to avoid describing the sales force as what it really was, unregistered brokers selling restricted shares of Terminus common stock on commission. The brokers contacted prospective investors through cold calls and personal meetings. Doumanis and Pantelakis distributed to prospective investors various written materials, including PPMs and business plans. Pratte also assisted the brokers in their illegal activity by participating in telephone calls to pitch prospective investors. Doumanis, Pantelakis, and Pratte signed checks to the unregistered brokers drawn on Terminus bank accounts that compensated each broker based on his success in raising funds.

**Material Misrepresentations and Omissions in the Terminus PPMs**

28.     Pratte, Pittera, Doumanis, and Pantelakis all contributed to drafting the PPMs, which were dated October 2008, March 2010, and September 2011, respectively. Pratte and Pittera had ultimate authority over the content of the PPMs. Each version of the PPM contained material misrepresentations and omissions.

29.     In the PPMs, Terminus falsely represented that sales commissions paid to those who marketed and sold Terminus securities would be no more than 13% of the amount raised from investors. In fact, Terminus paid the unregistered brokers over 30% of the amount received from investors. Pratte, Doumanis, and Pantelakis knew of the real pay-out rate because they worked with the brokers and wrote checks to them on Terminus bank accounts after funds were deposited by investors. Alborano was paid at least 30% of the amount he raised from investors.

30.     Terminus also misrepresented the use of proceeds supposedly earmarked for research and development ("R&D"). The PPMs stated that "approximately $1,001,407.50 has been allocated to two contracts for research and development … and an additional $240,000 has been allocated for working capital …."

31.     As Pratte, Doumanis, and Pantelakis knew, only meager initial payments were made to the contracting R&D parties, which by approximately the end of 2008 had halted work on the purported fuel cell because of non-payment by Terminus.  Nonetheless, at least through the end of 2011, Pratte, Doumanis, and Pantelakis collaborated on and circulated successive versions of the PPMs that continued to describe those contracts as if Terminus was receiving R&D services pursuant to these agreements.  Indeed, because of the excessive pay-outs to the unregistered brokers and the misappropriation by Pratte, Doumanis, and Pantelakis, as described more fully herein, Terminus lacked the funds needed to make payments on these contracts.

32.     Though the PPMs listed Pittera and Pratte as officers, the PPMs failed to disclose Doumanis's key role at Terminus, his criminal history, or Penny Stock Order Bar.  Further, the PPMs also failed to disclose Pantelakis's role at Terminus and his FINRA bar.  Pratte, Pittera, Doumanis, and Pantelakis all knew of Doumanis's and Pantelakis's actual role at Terminus.

33.     Under the heading "Security Ownership," the PPMs listed three companies as being owners of 23%, 15%, and 17%, respectively, of the company's common stock prior to the offerings.  However the PPMs omitted to disclose that these companies, which prior to the offerings collectively owned an outright majority of the company's stock, were controlled by Mann, who in 2004 had been convicted in this district of securities fraud and conspiracy, and was living in Cancún, Mexico under the aliases "Joseph Piccione" and "Stephano."  Pittera, Pratte, Doumanis, and Pantelakis each knew these facts concerning Mann and the companies that he controlled.  Indeed, Pratte, Doumanis, and Pantelakis traveled to Cancún in or about February 2008 to introduce Pratte to Mann and to secure Mann's approval of the business combination between Quintessence and Pratte's privately-held company.

**Material Misrepresentations and Omissions in Disclosures Published on OTC Markets**

34.     Terminus made periodic disclosures ("OTC Disclosures") on the OTC Link website (www.OTCMarkets.com) that were prepared and signed by Pittera from at least 2008 through 2011, and prepared by Pittera and signed by Pratte beginning in 2012 through at least 2014. The OTC Disclosures are governed by and follow a format prescribed by the "OTC Pink Basic Disclosure Guidelines" ("Pink Guidelines") published by OTC Markets.

35.     In signing the OTC Disclosures, Pittera and Pratte, respectively, certified each time that based on his knowledge, the OTC Disclosures did not contain "any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that the disclosures "fairly present in all material respects the financial condition . . . of the issuer."

36.     In addition, on multiple occasions until at least May 2, 2014, Pittera prepared and submitted Attorney's Letters opining that the OTC Disclosures were correct and in conformity with the Pink Guidelines.

37.     Nonetheless, as Pittera, Pratte, Doumanis, and Pantelakis knew, the OTC Disclosures contained numerous material misrepresentations and omissions.

*Disclosures about Terminus's Business Operations*

38.     Terminus repeatedly misrepresented in OTC Disclosures the true status of and prospects for the fuel cell product, misrepresenting that Terminus had viable prototypes or products capable of being sold and earning revenue.  Pratte, Doumanis, and Pantelakis knew that Terminus had neither a viable prototype of its fuel cell nor any product capable of being sold.

39.     For example, in OTC Disclosures for the years 2012, 2013, and 2014, Terminus claimed that its "ability to provide a less expensive and more reliable source of energy [the fuel cell] to electrical utility firms than existing products is clearly its primary competitive

advantage." However, Terminus had no such ability because it never completed the development of the fuel cell or any similar product and failed to make payments on any of its R&D contracts.

40.     The OTC Disclosures also state that Terminus's "initial capitalization costs also have been managed aggressively to shorten the technology's return on investment timeframe and also to maintain a competitive sales price without being required to pursue grants or subsidies." That claim of careful management of "initial capitalization costs" was false and misleading in light of the payment of over 30% of the proceeds of private placement offerings to the unregistered brokers and the diversion of substantial investor funds to Doumanis, Pratte, and Pantelakis, as described further herein.

41.     Terminus simply did not have the money to fund any R&D contracts, in part because of the misappropriation of funds described below and the excessive commissions paid to the brokers.

### Disclosures about Officers, Directors, Control Persons, and Beneficial Owners

42.     The OTC Disclosures also failed to disclose each of the issuer's executive officers, directors, general partners and control persons (beneficial owners of more than five percent (5%) of any class of the issuer's equity securities), as required by the Pink Guidelines. The OTC Disclosures also misrepresented Doumanis's and Pantelakis's legal and disciplinary history.

43.     With respect to Doumanis, the OTC Disclosures misrepresented Doumanis's role as a de facto executive officer of Terminus. They also misrepresented his role as a control person by virtue of his beneficial ownership of more than five percent of the outstanding shares of a class of securities in Terminus—a status reached by Doumanis as of September 29, 2010, as a result of a series of stock awards purportedly made in lieu of payment of salary. Nonetheless,

OTC Disclosures for the fiscal year ended December 31, 2010, and periodically thereafter until January 12, 2015, misrepresented Terminus's control persons by not including Doumanis among them.

44.     With respect to Pantelakis, the OTC Disclosures filed periodically between December 11, 2009 and April 15, 2011 (and not corrected until a filing on April 27, 2011), failed to disclose that Pantelakis, a director, had been permanently barred by FINRA.  In the line item for Pantelakis's "Legal/Disciplinary History," the OTC Disclosures signed by Pittera misstated that history as "unknown" or in some cases left it blank.  Pittera, however, knew at the time that Pantelakis had been barred by FINRA.  Pantelakis knew that his FINRA history was misrepresented in the OTC Disclosures yet he failed to take the necessary steps to correct the misstatement, despite the fact that he was asked to review and revise the OTC Disclosures prior to filing.

45.     With respect to Mann, Terminus listed as control persons in the OTC Disclosures the names of a number of offshore entities that owned large blocks of shares but failed to disclose that the entities were owned or controlled by Mann.  Indeed, after receiving a series of accusatory emails from an investor who had uncovered Mann's criminal record, Pantelakis urged removing all mention of Mann's companies from the OTC Disclosures.  Pratte concurred, writing to Pittera in an email that "[t]he facts are clear, Manny [Pantelakis] was forced out of his firm, George [Doumanis] went to prison for illegal financial activity and Stephano [i.e., Mann] is linked to organized crime, did prison time and uses several aliases. … [T]heir named association with the company must be minimized without delay."

46.     Pittera subsequently prepared the 2011 annual disclosures for Pratte's signature for Terminus to file with OTC Markets in May 2012.  Unlike filings in prior years, the

companies controlled by Mann were not listed as control persons, even though in fact they continued to be. Pittera then filed Attorney's Letters with OTC Markets affirming that the OTC Disclosures were accurate when he knew that they were not. The misrepresentations concerning control persons continued in periodic OTC Disclosures made through January 2015.

47.   In sum, Pittera, Pratte, Doumanis, and Pantelakis knew that the OTC Disclosures contained a series of false and misleading statements and half-truths concerning the roles and criminal and regulatory histories of Doumanis, Pantelakis, and Mann. Those statements and half-truths were material in that a reasonable investor would want to know that two control persons were felons who had been convicted of securities law violations and that a director had been barred by FINRA after consenting to a finding of facts that he had committed securities fraud.

**Material Misrepresentations to Investors in Press Releases, Telephone Calls and Elsewhere**

48.   False press releases touting Terminus's purported fuel cell business quickly followed the 2008 merger between Quintessence and Terminus. Doumanis, Pratte, and Pantelakis knew that the press releases contained materially false and misleading statements. Doumanis routinely drafted, disseminated, and filed the press releases with a press agency after securing input and approval from Pratte. Pantelakis would receive copies of the press releases before they were issued to the investing public. Among the press releases issued were the following:

- A press release on March 27, 2008 announcing the merger plan stated that Terminus "plans to market and sell power units that are developed and will be ready for fourth quarter 2008 distribution." As Pratte, Doumanis, and Pantelakis knew, no "power unit" (fuel cell) had been developed as of that date and could not be ready for distribution in the fourth quarter of 2008.

- A press release on June 23, 2011 announcing Terminus's development contract with a Colorado-based company ("Colorado Company"). The announcement

contained a germ of truth (the signing of a contract with an engineering company based in Colorado) but grossly exaggerated Terminus's current and future business prospects. The press release falsely stated that Terminus "is marketing and selling next generation fuel cell technology to a diverse customer base" (emphasis added). In fact, as Pratte, Doumanis, and Pantelakis knew, Terminus had nothing to market or sell and was certainly not engaged in doing so at that time. Further, the press release stated that Terminus "plans to manufacture 'TE-50' power generation units that will be ready for distribution in 2012." That claim was false and misleading. The contract with the Colorado Company defined a "research and development period" lasting four years and provided merely that "commercialization" (defined as manufacturing and selling a product) could occur when the Colorado Company and Terminus agreed that a product was ready, without specification of any date.

- A press release on September 15, 2011 quoting Pratte as stating that "we are meeting all target dates for our commercialization work," and repeating the earlier claims about distribution in 2012. Neither of these press releases disclosed that the development work was contingent on making monthly payments of $100,000 to the Colorado Company and that funds being raised from investors were not available as the funds were either being siphoned off by Pratte, Doumanis, and Pantelakis, or paid out in the form of excessive commissions to Alborano and other unregisterd brokers.

49.     Similarly, Pratte authored a business plan in mid-2012 that was distributed by Doumanis, Pantelakis, and Alborano to current and prospective investors. The business plan falsely claimed that "at the present time, we have the first 20,000 TE-50 systems pre-sold." The business plan also falsely stated that "[a]ll investment funds are used for commercialization and production of the TE-50 systems." Pratte knew that these statements were blatantly false as (1) no TE-50 systems had been pre-sold (because none existed) and (2) a substantial portion of investor funds had already gone to him, Doumanis, Pantelakis, Alborano, and others for illegitimate and undisclosed purposes.

50.     In June 2012, Pratte spoke extensively with a prospective investor who had been lined up by and received the executive summary of the business plan from one of the unregistered brokers. Pratte repeated on the telephone the lie that Terminus had "pre-sold $3.5 billion" of product and stated—shortly before the Colorado Company's cancellation of the

development contract for non-payment—that the Colorado Company was hard at work on the fuel cell prototype, which would be delivered by the end of 2012. The claim of $3.5 billion in already committed sales was based on a purported letter of intent from a buyer in South Asia, which, among other unfulfilled contingencies, required Terminus to make final shipment of all 20,000 units by September 1, 2011, which it could not.

51.     Pratte frequently participated in sales pitches to sell Terminus securities. For example, Pratte went to Pennsylvania to meet with the individual who prepared Alborano's taxes to pitch Terminus to the tax preparer and encourage him to assist Pratte and Alborano market Terminus securities to his other tax clients.

**Doumanis, Pantelakis, and Pratte Misappropriated Investor Funds**

52.     During the relevant time period, Doumanis misappropriated approximately $573,000 of Terminus investor funds to pay himself and his family members, make car payments, and pay personal credit card bills and his mortgage. These payments to Doumanis greatly exceeded the amount, if any, he might have been entitled to as compensation.

53.     During the relevant time period, Pantelakis misappropriated approximately $429,000 of Terminus investor funds to pay himself and his family, to make personal credit card payments, and to purchase two luxury automobiles. The majority of the payments were made by checks payable to Pantelakis's wife, M. Pantelakis. M. Pantelakis was not entitled to receive any funds from Terminus, and the payments to her greatly exceeded the amount, if any, Pantelakis might have been entitled to as compensation.

54.     Contrary to statements in the PPMs that compensation payments to Pratte were "deferred" and that his salary was "N/A," during the relevant time period, Pratte misappropriated at least $1.8 million of investor funds for deposit to his personal brokerage account and to an entity he used to pay personal expenses.

**Alborano Sold Terminus Securities Without Required Broker Registration**

55.     Alborano was a person engaged in the business of effecting transactions in securities for the account of others and therefore was as a "broker," as defined in the Exchange Act.  From at least late 2007 through November 2012, Alborano solicited investors and sold them Terminus securities, and securities of other issuers, in private-placement offerings. Alborano was not registered with the Commission pursuant Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] nor was he associated with any registered broker-dealer.  Terminus directly or indirectly paid Alborano over $1 million—mostly by checks written by Doumanis, Pantelakis, and Pratte—in commissions for his sales of Terminus securities.  From approximately January 2012 until at least January 2016, Alborano received commissions of at least $600,000 for his sales efforts on behalf of other microcap issuers.

**Doumanis Violated the Commission's Penny Stock Bar Order Against Him**

56.     The Penny Stock Bar Order barred Doumanis from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock.  The Penny Stock Bar Order was issued pursuant to Section 15(b)(6)(A) of the Exchange Act [15 U.S.C. § 78o(b)(6)(A)].

57.     During the relevant time period, Terminus's common stock was a "penny stock" because it was an equity security that did not meet any of the exceptions from the definition of a penny stock contained under Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1], and Terminus was therefore an issuer of a penny stock.

58.     Beginning in 2005 and continuing at least until 2014, Doumanis violated the Penny Stock Bar Order in numerous ways.  For example, while engaging in activities with Terminus, an issuer of a penny stock, he helped draft and circulate PPMs for the purpose of issuing shares of a penny stock; he drafted and caused the publication of press releases for the purpose of inducing the purchase of shares in a penny stock; and he retained and paid unregistered brokers to sell shares of a penny stock.

### FIRST CLAIM FOR RELIEF
**Violation of Section 17(a) of the Securities Act**
**(Terminus, Pratte, and Pittera)**

59.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

60.     Terminus, Pratte, and Pittera, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have: (a) knowingly or recklessly employed devices, schemes, or artifices to defraud; (b) negligently obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

61.     By reason of the foregoing, Terminus, Pratte, and Pittera, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Terminus, Pratte, and Pittera)

62.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

63.     Terminus, Pratte, and Pittera, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, have knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

64.     By reason of the foregoing, Terminus, Pratte, and Pittera, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (Doumanis and Pantelakis)

65.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

66.     Doumanis and Pantelakis, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have: (a) knowingly or recklessly employed devices, schemes, or artifices to defraud; and/or (b) negligently engaged in

19

transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

67.     By reason of the foregoing, Doumanis and Pantelakis, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)].

### FOURTH CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)
### (Doumanis and Pantelakis)

68.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

69.     Doumanis and Pantelakis, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, have knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

70.     By reason of the foregoing, Doumanis and Pantelakis, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)].

## FIFTH CLAIM FOR RELIEF
### Violation of Section 15(b)(6)(B)(i) of the Exchange Act
### (Doumanis)

71.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

72.    Doumanis, as to whom an order under Section 15(b)(6)(A) [15 U.S.C. § 78o(b)(6)(A)] of the Exchange Act was in effect, without the consent of the Commission, participated in an offering of a penny stock in contravention of such order.

73.    By reason of the foregoing, Doumanis, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o(b)(6)(B)(i)].

## SIXTH CLAIM FOR RELIEF
### Violation of Section 15(a)(1) of the Exchange Act
### (Alborano)

74.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

75.    Alborano made use of the mails or any means or instrumentality of interstate commerce to effect transactions in securities, or to induce or attempt to induce the purchase or sale of securities, without being associated with a broker or dealer that was registered with the Commission in accordance with Section 15(b) [15 U.S.C. § 78o(b)] of the Exchange Act.

76.    By reason of the foregoing, Alborano, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Alborano's Violation of Section 15(a) of the Exchange Act
### (Doumanis and Pantelakis)

77.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

78.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Doumanis and Pantelakis, directly or indirectly, singly or in concert, aided and abetted, and are therefore also liable for, Defendant Alborano's primary violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)], because they knowingly or recklessly provided substantial assistance to Defendant Alborano's violations of Section 15(a)(1) of the Exchange Act and unless enjoined, will again aid and abet violations of Section 15(a)(1) of the Exchange Act.

## EIGHTH CLAIM FOR RELIEF
### (M. Pantelakis as Relief Defendant)

79.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

80.     M. Pantelakis received Terminus investor funds that were transferred to her illegally.

81.     M. Pantelakis does not have a legitimate claim to the Terminus investor funds she received.

82.     By reason of the foregoing, M. Pantelakis should be required to disgorge the Terminus funds she received.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

## I.

Permanently enjoining each of the Defendants from committing, aiding and abetting or otherwise engaging in conduct that would make them liable for the violations of the federal securities laws alleged in this complaint.

## II.

Permanently enjoining Doumanis from directly or indirectly, including, but not limited to, through any entity controlled by him: (i) participating in the issuance, purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that such injunction would not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account.

## III.

Barring Pratte, Pittera, Doumanis, Pantelakis, and Alborano from participating in the offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## IV.

Barring Pratte, Pittera, Doumanis, and Pantelakis from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Ordering each of the Defendants and Relief Defendant to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts, jointly and severally to the extent appropriate.

## VI.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)].

## VII.

Issuing against Doumanis an order pursuant to Section 21(e)(1) of the Exchange Act

[15 U.S.C. § 78u(e)(1)] commanding him to comply with the Penny Stock Bar Order.

## VIII.

Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by

jury in this action of all issues so triable.

Dated: Miami, Florida
February 14, 2017

Respectfully submitted,

By: _____

Robert H. Murphy (RM 1748)
Andrew O. Schiff
Alejandro O. Soto
*Attorneys for Plaintiff*
U.S. Securities and Exchange Commission
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Tel:    (305) 982-6388 (Murphy)
        (305) 982-6390 (Schiff)
        (305) 982-6313 (Soto)
Fax:    (305) 536-4154
Email:  murphyrob@sec.gov
        schiffa@sec.gov
        sotoal@sec.gov

24